STATE OF LOUISIANA

VERSUS

ALONZO W. FORD AKA "LONNIE" AKA
"LON" AKA "LONZ" AKA "BIG FORD"

NO. 24-KA-197

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 19-4350, DIVISION "C"
HONORABLE JUNE B. DARENSBURG, JUDGE PRESIDING

February 26, 2025

**SUSAN M. CHEHARDY**
**CHIEF JUDGE**

Panel composed of Judges Susan M. Chehardy,
Jude G. Gravois, and John J. Molaison, Jr.

**CONVICTIONS AND SENTENCES AFFIRMED**
   **SMC**
   **JGG**
   **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
Honorable Paul D. Connick, Jr.
Thomas J. Butler
Andrea F. Long
Kristen Landrieu
Leo M. Aaron

COUNSEL FOR DEFENDANT/APPELLANT,
ALONZO FORD
Prentice L. White

DEFENDANT/APPELLANT,
ALONZO W. FORD
In Proper Person

**CHEHARDY, C.J.**

Defendant, Alonzo W. Ford, appeals his convictions and sentences for second-degree murder, possession of a firearm by a convicted felon, and obstruction of justice. For the reasons that follow, we affirm Ford's convictions and sentences.

**PROCEDURAL HISTORY**

On July 25, 2019, a Jefferson Parish Grand Jury indicted defendant, Alonzo W. Ford a/k/a "Lonnie" a/k/a "Lon" a/k/a "Lonz" a/k/a "Big Ford" ("Ford"), with attempted second-degree murder in violation of La. R.S. 14:27 and La. R.S. 14:30.1 (count one), two counts of possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (counts two and four), two counts of obstruction of justice in violation of La. R.S. 14:130.1 (counts three and five), and two counts of second-degree murder in violation of La. R.S. 14:30.1 (counts six and seven). Ford was arraigned on July 31, 2019, and pled not guilty to all counts. On September 16, 2019, the State amended the indictment to remove one of the predicate convictions from both count two and count four. On May 25, 2022, Ford filed a motion to sever that was denied the next day after a hearing.

On November 27, 2023, the case proceeded to trial before a twelve-person jury, and on November 30, 2023, the jury found Ford not guilty on count one and guilty as charged on counts two through seven. On January 9, 2024, defense counsel filed a motion for new trial and a motion for post-verdict judgment of acquittal. Ford filed a *pro se* motion for new trial and motion for post-verdict judgment of acquittal on January 10, 2024.

On January 11, 2024, the trial court denied the motions for new trial and the motions for post-verdict judgment of acquittal. After defense counsel waived sentencing delays, the trial court sentenced Ford to imprisonment at hard labor for twenty years each on counts two and four (possession of firearm), imprisonment at

hard labor for forty years each on counts three and five (obstruction of justice), and life imprisonment at hard labor each on counts six and seven (second-degree murder). The trial court ordered the sentences on counts two, four, six, and seven to be served without benefit of parole, probation, or suspension of sentence. It also ordered the sentences on counts two, three, four, and five to run concurrently with each other. The trial court further ordered the sentence on count six to run consecutively to the sentences on counts two, three, four, and five. It ordered the sentence on count seven to run consecutively to the other sentences.

On January 15, 2024, defense counsel filed a timely motion for appeal that was granted on January 18, 2024.

**FACTUAL BACKGROUND**

At trial, the State presented testimony and other evidence in an attempt to establish that defendant, Alonzo Ford, shot and killed Martin Hatten on March 30, 2019, and Lawrence Hensley on April 1, 2019; that he was a convicted felon who could not lawfully possess a firearm; and that he committed obstruction of justice in connection with each killing.

***Detective Anthony Buttone***

Detective Buttone of the Jefferson Parish Sheriff's Office (JPSO) testified that he investigated the homicide of Martin Hatten that occurred in the early morning hours of March 30, 2019.[1] He explained that patrol personnel responded to the shooting at 6221 Second Avenue in Marrero, Louisiana, where they found Hatten, who had a gunshot wound to his head, and James Steib, who sustained a minor gunshot wound to his neck after the bullet passed through Hatten's head. Detective Buttone further explained that, based on Hatten's injuries, he and other homicide detectives were notified and proceeded to the scene. He asserted that the

---

[1]    JPSO Detective Kyle Nugent testified at trial that an incident report was generated by a 9-1-1 call that was made at 2:41:10 on March 30, 2019.

two victims had already been transported to the hospital by the time he arrived.[2] Detective Buttone indicated that the shooting occurred inside a gold Dodge Durango, which was parked in front of the residence on Second Avenue.

Detective Buttone explained that they found evidence at the scene, namely, a driver's license or identification card for Steib, a crack pipe, a projectile on the ground, and a plastic baggy, which he advised was commonly used for narcotics sales. He stated that because no casing was located, which was rare, they believed a revolver was used in the shooting. Detective Buttone testified that detectives secured video surveillance from a neighborhood residence that captured the shooting and the individual, who was later identified as defendant, Alonzo Ford, walking to the vehicle prior to the shooting.

Detective Buttone testified that they interviewed Steib once he was released from the hospital. Detective Buttone recalled Steib informing them that he was present for the shooting; that an individual named Ken Mayeaux was getting into the vehicle at the time of the shooting; and that Hatten was in the front passenger seat of the vehicle. Steib also told Detective Buttone that he had intended to take Mayeaux to the Siesta Motel. He further recalled Steib stating that when he got into the car and tried to start the vehicle, a shot rang out and that he felt pain. Detective Buttone testified that Steib identified Ford as the shooter.

Detective Buttone further testified that based on this information, they located Mayeaux and interviewed him. Detective Buttone claimed that Mayeaux identified the same people in the vehicle and told him that, prior to entering the back seat behind Hatten, he saw Ford, with whom he shook hands. Detective Buttone stated that Mayeaux advised that as he was getting into the vehicle, a shot rang out just as he was closing the door. Detective Buttone stated that during the

---

[2]    He stated that Hatten was alive at that time but later died. Dr. Ellen Connor testified that on April 8, 2019, she performed the autopsy of Hatten. She concluded that Hatten died as a result of a gunshot wound to the head and that the manner of death was homicide.

interview, Mayeaux provided them with the phone number of a man named Aaron Drummond,[3] after which they obtained a search warrant for real-time GPS locations from the provider.

According to Detective Buttone, Mayeaux also provided them with a description of a vehicle that arrived at his motel after the shooting.[4] Detective Buttone explained that they tracked the phone and located that vehicle at the end of Manhattan Boulevard past Lapalco Boulevard. He stated that they conducted an investigatory stop of that vehicle, inside of which was Drummond, who was operating the vehicle, and Drummond's girlfriend. He testified that Drummond and his girlfriend were brought to the investigation bureau for purposes of obtaining their statements. Detective Buttone maintained that Drummond informed him that he was not present for the shooting of Hatten or Steib.

Detective Buttone recalled that Drummond told him that following the shooting, he received a call from Mayeaux, who told Drummond about the shooting and that Ford was responsible for it. Detective Buttone asserted that Drummond said that he went to Ford's residence on Garden Road in Marrero and picked him up, after which the two of them went to the Siesta Motel to visit Mayeaux. He said that Drummond claimed that during the drive, Ford admitted to him that he shot Hatten.[5] Detective Buttone provided that Drummond told him that when they arrived at the Siesta Motel, Ford talked to Mayeaux, after which Drummond and Ford left. He further asserted that they obtained Ford's phone number from Drummond at that time. Detective Buttone testified that they sent a search warrant to the provider in an attempt to get the real-time GPS location.

---

[3]    Detective Buttone testified that they originally thought the number was for Ford, but that it actually belonged to Drummond.

[4]    There was no testimony as to the make or model of this vehicle.

[5]    At trial, Drummond denied telling law enforcement that Ford shot the gun. Also, Detective Buttone testified that one week prior to trial, he learned of a letter written by Drummond wherein he claimed that the statement he had given to law enforcement was not true and that he had been threatened by the JPSO that they would take his son away from him if he did not give a statement.

Detective Buttone further testified that Mayeaux, Drummond, and Steib viewed six-person photographic lineups and positively identified Ford as the shooter of Hatten. He averred that during the investigation, they received information from Kimberly Fluker, Hatten's fiancée, who told them that prior the shooting, Hatten and another individual were involved in a verbal altercation outside the business of "Tinnies" or "O on the Boulevard." According to Detective Buttone, Fluker claimed that the altercation started when this individual hit on her and asked her for a cigarette. Detective Buttone testified that after showing Fluker a photographic lineup, she positively identified Ford as the person involved in the verbal altercation with Hattan before the shooting.[6]

Detective Buttone provided that they obtained a search warrant for Ford's residence on Garden Road in Marrero but found no evidence. He stated that while they were there, they told Ford's mother that they had an arrest warrant for Ford, after which she called Ford and allowed Detective Buttone to talk to him. According to Detective Buttone, although Ford told him he would surrender, he never did. Ford's mother then gave them the phone number Ford was calling from and with that they prepared a search warrant to obtain the real-time GPS location from the provider. He explained that they began getting pings or location data, and thereafter, enlisted the JPSO Strategic Engagement Team ("SET") to find and apprehend Ford.

### SET Detective Patrick Evans

Detective Evans testified that on April 1, 2019, the SET was advised that the last location of the ping received from Ford's phone was at a car wash located at Acre Road and Buccola Avenue in Marrero. He stated that when he pulled up to the car wash, he saw an individual who he believed was Ford wearing a brown hoodie standing in the second stall from Buccola Avenue. Detective Evans

---

[6]     Fluker testified similarly at trial.

explained that Ford was standing on the passenger rear side of a red or maroon Toyota pickup truck speaking to a black male wearing a baseball cap.

Detective Evans testified that he let his team members know that he saw an individual fitting Ford's description at the car wash. Detective Evans stated that he drove around the block and circled back around. He explained that as he did so, the red truck was pulling onto Acre Road and going toward Cohen Street. Detective Evans noticed that in the same stall there was a gentleman seated against the wall next to the passenger side where the red truck was, slumped over, and his hat was down. Detective Evans explained that he believed Ford had left in the red truck, so he advised his team where the truck was going. He stated that once he learned the man had been shot, he started to secure the scene. The victim was later identified as Lawrence Hensley.[7]

### Detective William Roniger

Detective Roniger testified that he was called to the scene of a homicide on April 1, 2019. He explained that a person was shot at the car wash on Acre Road and transported to the hospital, but later died.[8] Detective Roniger asserted that no casings were found at the car wash. He also asserted that Ford was apprehended a short distance away in the 1200 block of Cohen Street. Detective Roniger averred that Ford's clothing, shoes, wallet, and the firearm believed to be the murder weapon were recovered from that scene.[9] He recalled that the gun was located

---

[7]     Detective Buttone testified that they believed Hensley was killed because he witnessed the homicide of Hatten. He stated that during the investigation, everyone indicated that Ford was responsible for Hatten's homicide.

[8]     Dr. Ellen Connor testified that she performed an autopsy on Hensley on April 4, 2019. She further testified that he died as a result of a gunshot wound to his head and that the manner of death was homicide.

[9]     Although Detective Roniger testified that this was the "murder weapon," the test results were inconclusive. Former JPSO Deputy Jene Rauch was accepted as an expert in the field of firearms and toolmark examinations. She testified that she test fired the gun, which had one casing and two live rounds when recovered, and compared the projectile from the Second Avenue homicide to the firearm. Deputy Rauch testified that "[a]lthough Specimen No. 1 possessed the same general class characteristics as the Smith and Wesson revolver, meaning that they were both .38-cailber class, both had five lands and grooves with a right twist. They did not possess sufficient individual characteristics for any further conclusion to be made."

along a fence line a few feet from where Ford was placed under arrest. He stated that when they located the red truck on Cohen Street, Trameeka Mosely and Danielle Landry were in the truck with Ford. All three were brought to the detective bureau.

Detective Roniger testified that he interviewed Ford regarding the April 1, 2019 shooting, and Detective Buttone testified that he interviewed Ford regarding the March 30, 2019 shooting. The interviews yielded one statement, which was audio and video recorded. In his statement, Ford denied responsibility for either of the shootings.[10]

Detective Roniger further testified that they obtained a search warrant for the red truck and that it was later executed. An Academy Sports bag containing various items was found on the back seat of the truck. Detective Roniger explained that this was significant because Ford and the two females were later found on video stealing those items from Academy Sports earlier that day. He stated that Ford was wearing the same clothes at Academy that he was wearing when he was arrested. He also stated that when Ford was arrested, his shoes were collected as they matched the shoes he was wearing in the Academy video.

Detective Roniger recalled listening to a jail call Ford made to two associates wherein Ford directed them to the same location where the detectives recovered the firearm believed to be the murder weapon. Detective Buttone testified that during the investigation, he also listened to Ford's jail calls. Specifically, he stated there was a call made from the jail on April 12, 2019, where Ford and Drummond discussed two witnesses and a firearm. Detective Buttone

---

[10] The video was played for the jury. In his statement, Ford denied that he committed the shootings; that he was in the area of Second Avenue at 2:30 a.m.; that he was in or near a red truck; that he was at the car wash; or that he was with two females stealing items from stores. Ford claimed that Steib had his phone. He had no explanation why the video showed him at the vehicle during the first shooting or why people identified him as saying he shot the victims.

Also, Detective Buttone testified that Ford stated he was at a bar called Smithy's around the time of the first homicide until 5:00 a.m. However, Detective Buttone explained that he spoke to the bar manager, who told him that bar was closed at 3:00 a.m.

explained that in that same call, Ford tried to describe the area to Drummond where the firearm was located. Detective Buttone stated that in another call made to an unknown female on April 4, 2019, it appeared that they were referring to Mayeaux and the intent to possibly harm him. During that call, Ford referred to "Slim" (Steib) and "Cracker" (Mayeaux)[11] stating, "Kill'em."[12]

### SET Sergeant Wayne Rumore

Sergeant Rumore testified that a ping from Ford's phone placed Ford on Acre Road off of Ames Boulevard in Marrero near a car wash, so he proceeded to that area to look for Ford. He stated that he located the red/maroon truck parked at a house on Cohen Street. He claimed that upon seeing law enforcement, Ford fled on foot down an alleyway, and Trooper David Webster followed him. While he fled, Ford discarded several items, including a firearm and his sweatshirt.

### Trooper David Webster

Trooper Webster testified that on April 1, 2019, he was a member of the JPSO's SET team and, based on a cell phone ping, along with other officers, he was trying to locate and apprehend Ford. He was travelling behind Sergeant Rumore when the sergeant located Ford's truck on Cohen Street. As soon as he got out of his vehicle and Ford spotted them, Ford took off on foot running down an alleyway next to a residence. Trooper Webster testified that he proceeded to give chase on foot to apprehend Ford. In the processing of fleeing, Ford discarded a shoe, a hat, a wallet containing his identification, among other things, and a cell phone. He explained that he found Ford, who had already discarded his jacket, squatting down near the front right wheel of a vehicle parked in a driveway, attempting to shove something underneath the wheel well. Trooper Webster testified that he placed Ford in handcuffs, read him his rights, and transferred him

---

[11] Detective Buttone indicated that Mayeaux was also known as "Cracker" and "White Boy." He stated that Mayeaux was the only white individual involved in the investigations.

[12] This phone call was played for the jury.

to the homicide detectives. Trooper Webster stated that he retrieved Ford's jacket, which was located next to the vehicle where he apprehended Ford. He did not find a gun on Ford's person.

### Detective Adrian Thompson

Detective Thompson, Narcotics Division, is a K9 handler for the JPSO. He testified that his K9 is a munition's detection canine, who locates firearms that have recently been fired, spent shell casings, live ammunition, loaded firearms, and a number of other explosive odors. He further testified that on April 1, 2019, he was dispatched with his K9 to the scene of where Trooper Webster had chased Ford in order to search the area for the murder weapon. The K9 ultimately located the firearm hidden in the overgrown grass adjacent to a chain-linked fence.

### James Steib

Steib testified that, in the spring of 2019, he lived at 6221 Second Street with his grandmother. He stated that it was considered the neighborhood drug house and that a shooting occurred one night outside the house. He further testified that, on that occasion, he pulled up to the house in a car. He was in the driver's seat, that his partner (Hatten) was in the front passenger seat, and that "White Boy" (Mayeaux) got in the back seat. Steib claimed that he heard a "pow" and that when he looked, he saw the bullet come out of his partner's head and hit him. Steib testified that he called 9-1-1. He denied that he told law enforcement that Ford shot the gun. He also denied seeing Ford at the car prior to the shooting. Steib further testified regarding his own prior convictions.

### Ken Mayeaux

Ken Mayeaux's testimony at trial was similar to that of Detective Buttone. Mayeaux testified that he walked to Steib's house to buy drugs; that Steib did not have any drugs; and that Steib ("Slim") agreed to drop him off at his motel. Mayeaux further testified that right before he got into the vehicle, he saw Ford

standing next to the vehicle on the passenger side; that Mayeaux got into the back seat of the vehicle and shut the door; that he heard a "pop;" that Steib jumped out and said, "You shot me;" that he looked in the front seat and saw the man in the passenger seat's head to the side; and that he walked out in the street and waited for the police. Mayeaux claimed that he did not see who shot the victim. He asserted that later that morning, Ford and Drummond ("Wax") came to his motel room; however, he could not remember what they talked about. Mayeaux stated that he positively identified Ford in a photographic lineup as the person standing next to the vehicle on the passenger front side when the victim was shot. He was shown a video, and in it, identified himself, Ford, and others by the car near Steib's house. Mayeaux testified that the video also showed the shot and Steib jumping out of the vehicle saying he was shot. He also testified regarding his own prior convictions.

### Carl Kennedy

Kennedy testified that the victim of the second homicide, Lawrence Hensley, was his second cousin. He stated that he had been incarcerated with Ford, and that Ford told him he was in jail for "two-and-a-half murders." Kennedy asserted that Ford claimed he shot and killed a victim, explaining that the bullet went through that victim and hit the second victim while they were in a car or a truck. Kennedy claimed that Ford also told him he killed someone else.

Kennedy provided that, in regards to the second murder, Ford told him that he and two females were in a truck; that they were shoplifting; that they went to a car wash; that Hensley was with them; and that they were using drugs. Kennedy recalled that Ford told him that he and Hensley "got into it" and that Ford shot Hensley in the head. Kennedy also recalled that Ford told him that the police followed him, after which he got rid of the weapon. Kennedy admitted to several

prior convictions; however, he testified that the State never told him that they would dismiss his simple escape charge in exchange for testifying at trial.[13]

### *Aaron Drummond*

Drummond testified that he was Ford's friend; that Mayeaux called him after Hatten's murder; that he found out something happened on Second Street; that he met with Ford that day; and that he and Ford went to Mayeaux's residence. Drummond further testified that he talked to law enforcement after the two murders. He denied that he told law enforcement that Ford told him he was going to kill Hensley. He claimed that law enforcement forced him to say Ford shot someone. Drummond stated that he wrote a letter indicating that the detectives threatened him with information regarding his son. He admitted being at the car wash when Hensley was killed. He further admitted that Ford, Trameeka Mosley, and Danielle Landry were also at the car wash. Drummond testified that he did not tell Hensley to leave because Ford wanted to kill him. He also testified regarding his own prior convictions.

### *Joint Stipulations*

The State and the defense stipulated that Ford was convicted of violating La. R.S. 40:967(A), possession with the intent to distribute cocaine, on February 20, 1997, in the Twenty-Fourth Judicial District Court for the Parish of Jefferson, case number 96-7172, Division "S," and that he completed his sentence on May 25, 2018. The State and the defense also stipulated that Ford was convicted of two counts of violating La. R.S. 14:27 and La. R.S. 14:30.1, attempted second-degree murder, on February 21, 1995, in the Twenty-Fourth Judicial District Court for the

---

[13] Detective Buttone testified that they interviewed Kennedy, who was at the correctional center in April and May of 2019. He stated that he learned that Ford and Kennedy were in the same cell at the same time. He testified that he did not promise Kennedy anything in exchange for his information and that he did not broker a deal to have one of Kennedy's charges dismissed or reduced.

Parish of Jefferson, case number 94-2419, Division "O," and that he completed his sentence on September 6, 1996.

**ASSIGNMENTS OF ERROR**

On appeal, Ford raises two counseled assignments of error: (1) his convictions and sentences were contrary to the weight of the evidence presented at trial and should be reversed;[14] and (2) the district court committed reversible error when it improperly denied his motion to sever. In addition, Ford raises four *pro se* assignments of error: (1) the State violated the constitutional mandates of Federal Rules of Evidence, Rule 602; (2) the State violated the constitutional mandates required by La. C.Cr.P. arts. 770(1)(2) and 771(1); (3) the State violated the constitutional mandates required by the United States Constitution, Amend. V, and the Louisiana Constitution, Art. I, § 15; and (4) the State violated the constitutional mandates required by Federal Rules of Evidence, Rules 402 and 103.

### 1. *Insufficiency of Evidence*

On appeal, Ford's counsel argues the evidence was insufficient to support his convictions as it did not conclusively prove that Ford was the shooter of either Hatten or Hensley. Counsel asserts that the jury gave undue weight to the testimony of the State's alleged witnesses even though they had either lied to law enforcement about Ford's involvement in the shootings, or their recollection could not be trusted because they were highly intoxicated or motivated to implicate Ford to receive leniency from the State regarding their respective felony charges. He further asserts there was no DNA evidence connecting Ford to the firearm found by the police and that he was not in possession of a firearm at the time of his arrest.

---

[14] Ford's counsel contends that Ford's convictions and sentences were contrary to the weight of the evidence; however, counsel did not brief the issue regarding Ford's sentences. Under Uniform Rules–Courts of Appeal, Rule 2–12.4(B)(4), the Court may consider as abandoned any assignment of error or issue for review which has not been briefed. *State v. Kimble*, 22-373 (La. App. 5 Cir. 5/8/24), 389 So.3d 902, 907, *writ denied*, 24-882 (La. 12/27/24), 2024 WL 5232585. However, in his third *pro se* assignment of error, Ford raised the excessiveness of his sentences.

In response, the State avers that after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. The State further responds that the testimony and evidence at trial established that Ford was a convicted felon, who could not lawfully possess a gun; that he fatally shot Hatten on May 30, 2019, and Hensley on April 1, 2019; and, that he committed the crime of obstruction of justice in relation to each murder. For these reasons, the State maintains that Ford's convictions and sentences should be affirmed.

In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct, circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); *State v. Robinson*, 11-12 (La. App. 5 Cir. 12/29/11), 87 So.3d 881, 892-93, *writ denied*, 12-279 (La. 6/15/12), 90 So.3d 1059.

Evidence may be either direct or circumstantial. *State v. Robertson*, 22-363 (La. App. 5 Cir. 03/29/23), 360 So.3d 582, 590. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 provides, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." On appeal, the reviewing court does not determine if another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events. *State v. Williams*, 14-882 (La. App. 5 Cir. 5/14/15), 170 So.3d 1129, 1136, *writ denied*, 15-1198 (La. 5/27/16), 192 So.3d 741. Instead, the appellate court must evaluate the evidence in a light most favorable to the State and determine whether the possible alternative

hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.  *Id.*

Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator.  *State v. Garrison*, 19-62 (La. App. 5 Cir. 4/23/20), 297 So.3d 190, 203, *writ denied*, 20-547 (La. 9/23/20), 301 So.3d 1190, *cert. denied*, - - U.S. - - , 141 S.Ct. 2864, 210 L.Ed.2d 967 (2021). Where the key issue in the case is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof.  *Id.* at 204.  Positive identification by only one witness is sufficient to support a conviction.  *State v. Harrell*, 19-371 (La. 7/08/20), 299 So.3d 1274, 1281.  In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a requisite factual finding.  *State v. Benoit*, 07-35 (La. App. 5 Cir. 5/29/07), 960 So.2d 279, 284.

### a.  Second-Degree Murder

Ford was convicted of two counts of second-degree murder, defined, in pertinent part, as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm.  La. R.S. 14:30.1(A)(1).[15]  Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."  La. R.S. 14:10(1).  Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the conduct of the defendant.  Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person, as well as the extent and severity of the

---

[15]     The jury was instructed that in order to convict Ford of two counts of second-degree murder, it had to find that he acted with the specific intent to kill or to inflict great bodily harm.

victim's injuries. *State v. Thompson*, 18-273 (La. App. 5 Cir. 11/28/18), 259 So.3d 1257, 1266, *writ denied*, 18-2077 (La. 9/6/19), 278 So.3d 372.

### *Martin Hatten*

Detective Buttone testified that they secured video surveillance that captured the shooting and showed Ford walking to the vehicle prior to the shooting. Mayeaux testified that right before he got into the back seat of Steib's vehicle, he saw Ford standing next to the vehicle on the passenger side. Hatten was sitting in the front passenger seat of the vehicle. Mayeaux asserted that he got into the vehicle, after which he heard a shot, looked in front, and saw Hatten's head to the side. Kennedy testified that Ford told him he shot and killed a victim, explaining that the bullet went through that victim and hit the second victim while they were in a car or a truck. Kennedy also testified that Ford admitted to him that he killed another victim at a car wash. Also, Fluker testified that Ford and Hatten were involved in a verbal altercation prior to the first shooting.

Additionally, Detective Buttone testified that Steib informed him that at the time of the shooting, he was in the driver's seat of the vehicle; that Mayeaux was getting into the vehicle; and that Hatten was sitting in the front passenger seat. Detective Buttone claimed that Steib said he then heard a shot, and felt pain. He stated that Steib positively identified Ford as the shooter. Also, Detective Buttone explained that Drummond said that Mayeaux told him Ford was responsible for the shooting. He stated that Drummond also told him that when he and Ford were driving to the Siesta Motel to visit Mayeaux, Ford admitted that he shot Hatten.

Based on our review, we find the evidence supports the jury's conclusion beyond a reasonable doubt that Ford had specific intent to kill when he pointed the gun and fired at Hatten, who died from a gunshot wound to the head. *See Thompson*, *supra*. The record shows that Ford knew that there was an arrest warrant issued for him, but he failed to turn himself in even though he said he

would.  Further, the evidence establishes that he hid the weapon in his sweatshirt while he was being pursued by law enforcement prior to his capture.  Evidence of flight, concealment, and attempt to avoid apprehension is relevant and admissible to prove consciousness of guilt from which the trier-of-fact may infer guilt.  *State v. Davis*, 18-485 (La. App. 5 Cir. 4/10/19), 269 So.3d 1123, 1132, *writ denied*, 19-716 (La. 11/12/19), 282 So.3d 229.  Ford placed a jailhouse call where it appears he was directing two associates to the same location where the detectives recovered the weapon.  Ford placed another jailhouse call where it appears that he gave directions to kill Steib and Mayeaux.  Evidence regarding a defendant's attempt to threaten, kill, intimidate, or dissuade a witness from testifying is admissible and relevant to show consciousness of guilt on the defendant's part and his desire to evade prosecution.  *State v. Butler*, 15-89 (La. App. 5 Cir. 7/29/15), 171 So.3d 1283, 1289, *writ denied*, 15-1608 (La. 10/10/16), 207 So.3d 408.

On appeal, Ford's counsel argues the jury gave undue weight to the testimony of the State's witnesses despite the fact that they had either lied to law enforcement or their recollection could not be trusted because they were intoxicated or motivated to implicate Ford to receive leniency from the State regarding their felony charges.  We disagree.  The jury heard the testimony and clearly found the State's witnesses to be credible, even though Steib and Drummond changed their stories at trial.  Where there is conflicting testimony as to factual matters, the question of the credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness.  Reviewing courts will not re-weigh the credibility of witnesses on appeal.  *State v. Rowan*, 97-21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

For these reasons, we find that a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient under the *Jackson* standard to support Ford's conviction for the second-degree murder of Hatten.

### *Lawrence Hensley*

Detective Buttone testified that they obtained a search warrant for Ford's phone after the first murder and that they began getting pings or location data. Detective Evans testified that the last location of the ping was at a car wash located at Acre Road and Buccola Avenue in Marrero. He further testified that when he went to the car wash, he observed a man he believed to be Ford wearing a brown hooded sweatshirt standing on the passenger side of a red/maroon truck speaking to a black male. Detective Evans circled around the block, and when he returned, the truck was pulling out onto Acre Road and heading towards Cohen Street. He saw the man Ford had been talking to seated against the wall and slumped over. Detective Evans later learned that Hensley, the man he saw talking to Ford, had been shot in the head.

Sergeant Rumore testified that after he located Ford, who wearing his brown hooded sweatshirt, standing next to his red/maroon truck with two women on Cohen Street, once Ford recognized him as law enforcement, Ford fled on foot down an alleyway. Trooper Webster testified that he pursued Ford on foot down the alley and that during the chase, Ford discarded a shoe, his hat, wallet, and a cell phone. When he finally caught up to Ford, one or two lots over, Ford was squatting next to the front wheel of a vehicle attempting to shove something into the wheel well. After Trooper Webster handcuffed Ford and turned him over to law enforcement, he retrieved Ford's brown jacket located next to the car where he found Ford. Detective Evans testified that he went to the scene and identified the brown hooded sweatshirt or jacket that had been pulled out from under the car as the one that Ford was wearing. Although Trooper Webster did not find a weapon

on Ford, Detective Roniger testified that a gun was ultimately located along the fence line a few feet from where Ford was placed under arrest. The revolver contained one casing and two live rounds. Casings were not found at either crime scene, indicating to law enforcement that a revolver had been used in both homicides.

Kennedy testified that Ford told him that he and two females were in a truck, that they were shoplifting, that they went to a car wash, that Hensley was with them, and that they were using drugs. Kennedy further testified that Ford told him that he and Hensley got into an argument, after which Ford shot Hensley in the head. Kennedy recalled that Ford told him that the police followed him and that he got rid of the weapon.

Additionally, the evidence at trial established that the red/maroon truck in which Ford fled from the car wash was linked to a shoplifting incident at Academy Sports hours before the shooting. Detective Roniger testified that the video surveillance from Academy showed that the clothing that Ford was wearing at the time (red shirt, red pants) was the same clothing Ford wore at the time of his interview with detectives. Also, Drummond testified that he and Ford were at the car wash along with Mosley and Landry, the two females that with Ford by the truck on Cohen Street.

We find there is sufficient evidence for the jury to have found that Ford had the specific intent to kill when he pointed the gun and fired at Hensley, who died from a gunshot wound to the head. *See Thompson*, *supra*. Moreover, the jury considered evidence that Ford fled from police, hid evidence, and made jailhouse calls instructing associates to locate evidence and kill witnesses. Evidence of flight, concealment, attempt to avoid apprehension, and attempt to kill witnesses is relevant and admissible to show consciousness of guilt. *See Davis*, *supra*; *Butler*, *supra*. For these reasons, we find that a rational trier of fact could have determined

beyond a reasonable doubt that the evidence was sufficient under the *Jackson* standard to support Ford's conviction of the second-degree murder of Hensley.

### b. Possession of a Firearm by a Convicted Felon

Ford was convicted of two counts of possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (counts two and four). To support a conviction under La. R.S. 14:95.1, the State must prove beyond a reasonable doubt that defendant had: (1) possession of a firearm; (2) a prior conviction for an enumerated felony; (3) absence of the ten-year statutory period of limitation; and (4) the general intent to commit the offense. *State v. Woods*, 23-41 (La. App. 5 Cir. 11/15/23), 376 So.3d 1144, 1156, *writ denied*, 23-1615 (La. 5/29/24), 385 So.3d 700. With respect to the third element, the State must prove that ten years has not elapsed since the date of completion of the punishment for the prior felony conviction. *Id.*

Actual possession of a firearm is not necessary to satisfy possession; constructive possession is sufficient. *State v. Johnson*, 11-238 (La. App. 5 Cir. 12/28/11), 83 So.3d 1075, 1081. A person is in constructive possession of a firearm if the firearm is subject to his dominion and control. *State v. Johnson*, 03-1228 (La. 4/14/04), 870 So.2d 995, 998; *State v. Mickel*, 09-953 (La. App. 5 Cir. 5/11/10), 41 So.3d 532, 535, *writ denied*, 10-1357 (La. 1/7/11), 52 So.3d 885. A person's dominion over a weapon constitutes constructive possession even if it is only temporary in nature and even if control is shared. *Johnson*, 03-1228, 870 So.2d at 999; *State v. Harrell*, 18-63 (La. App. 5 Cir. 10/17/18), 258 So.3d 1007, 1012. A defendant's mere presence in an area where a firearm was found does not necessarily establish possession. *State v. Perry*, 17-567 (La. App. 5 Cir. 6/27/18), 250 So.3d 1180, 1197, *writ denied*, 18-1325 (La. 11/14/18), 256 So.3d 285. The State must also prove that the offender was aware that a firearm was in his presence and that the offender had the intent to possess the weapon. *Id*. The

question of whether there is sufficient possession to convict is dependent on the facts of each case. *Mickel*, *supra*.

In the amended indictment, the State alleged in count two that on March 30, 2019, Ford violated La. R.S. 14:95.1 by possessing a handgun after having been previously convicted on February 20, 1997, of possession with the intent to distribute cocaine in violation of La. R.S. 40:967(A), in case number 96-7172, Division "S," in the Twenty Fourth Judicial District Court. The State also alleged in count two that Ford had a prior conviction on February 21, 1995, of two counts of attempted second-degree murder in violation of La. R.S. 14:27 and La. R.S. 14:30.1, in case number 94-2419, Division "O," in the Twenty Fourth Judicial District Court. In that same amended indictment, the State alleged in count four that on April 1, 2019, Ford violated La. R.S. 14:95.1 by possessing a handgun after having been previously convicted of the same predicate convictions that were listed above in count one.[16]

At trial, the State and defense counsel stipulated that Ford was convicted of possession with the intent to distribute cocaine on February 20, 1997, and that he completed his sentence on May 25, 2018. The State and defense counsel also stipulated that Ford was convicted of two counts of attempted second-degree murder on February 21, 1995, and that he completed his sentence on September 6, 1996.

Nevertheless, because more than ten years had elapsed since the date of completion of the punishment for the prior felony conviction, the prior conviction of two counts of attempted second-degree murder cannot be used as a predicate conviction in either count two or count four. The State and defense counsel

---

[16]    The amended indictment reflects that the State alleged that Ford had two prior convictions for each count. It appears that the State was permitted to do so. *See State v. Jones*, 22-527 (La. App. 5 Cir. 5/24/23), 366 So.3d 821, 833. ("Defendant was charged with violating La. R.S. 14:95.1, possession of a firearm by a convicted felon, and his two prior convictions were admissible for the purpose of proving that defendant had a prior felony conviction.").

stipulated that Ford completed his sentence for those predicate convictions on September 6, 1996; however, the instant offenses occurred in 2019. The prior conviction of possession with intent to distribute cocaine can be used as a predicate conviction in counts two and four because less than ten years has elapsed since the completion of the punishment for the prior felony conviction. The State and defense counsel stipulated that Ford completed his sentence for that predicate conviction on May 25, 2018.

Regardless, based on our review of the record, we find that a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to support Ford's convictions of possession of a firearm by a convicted felon in counts two and four. As previously discussed, the evidence was sufficient to establish that Ford possessed a firearm to kill Hatten on March 30, 2019, and Hensley on April 1, 2019, and that he later hid the firearm while fleeing from law enforcement. The record further establishes that Ford had a prior conviction for possession with intent to distribute cocaine, an enumerated felony, for counts two and four. Further, the State and defense counsel stipulated that Ford completed his sentence for that predicate conviction on May 25, 2018, which is less than ten years from when the instant offenses occurred. Lastly, we find the record supports a conclusion that Ford had the general intent to commit the offenses of possession of a firearm by a convicted felon.

### c. Obstruction of Justice

Ford was convicted of two counts of obstruction of justice in violation of La. R.S. 14:130.1, which provides, in pertinent part:

> A. The crime of obstruction of justice is any of the following when committed with the knowledge that such has, reasonably may, or will affect an actual or potential, present, or future criminal proceeding as described in this Section:

(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance …

(a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers[.]

In count three, the State alleged that on March 30, 2019, Ford violated La. R.S. 14:130.1 in that he obstructed justice by tampering with evidence, to wit: taking the .38 caliber handgun he used to shoot Steib and Hatten from the scene of the shooting. In count five, the State alleged that on April 1, 2019, Ford violated La. R.S. 14:130.1 in that he obstructed justice by tampering with evidence, to wit: taking the .38 caliber handgun he used to shoot Hensley from the scene of the shooting and subsequently discarding it and/or discarding clothing that he was wearing at the time he shot Hensley.

We find the evidence was sufficient under the *Jackson* standard to support Ford's conviction of two counts of obstruction of justice. First, as discussed heretofore, the evidence was sufficient to establish that Ford shot both victims and then left the crime scenes with the firearm—a revolver—which law enforcement believed was the murder weapon. Additionally, Trooper Webster testified that after the second shooting, he chased Ford down an alleyway and that as Ford fled, he discarded several items along the way. When Trooper Webster caught up to Ford, he witnessed Ford squatting down near the front right wheel of a vehicle, shoving something underneath the wheel well. Detective Evans later identified the item as the brown hooded sweatshirt Ford had been wearing. Detective Thompson indicated that on April 1, 2019, he went to the scene of the chase, where his K9 found the firearm hidden in the overgrown grass near a chain-link fence. Also,

Detective Roniger testified that he listened to a jail call Ford made to two associates wherein he directed them to the same location where the detectives recovered the firearm that they believed was the murder weapon.

In *State v. Loggins*, 23-519 (La. App. 5 Cir. 10/30/24), --- So.3d ---, 2024 WL 4612601, this Court found that the State sufficiently established that the defendant obstructed justice. Surveillance video from a gas station showed the defendant leave with the murder weapon in his hand. The defendant later told his brother that he threw his gun in a trash can at another gas station. Surveillance video from that gas station depicted the defendant walking to the dumpster. This Court found that although the firearm was never recovered, a reasonable juror could conclude that by disposing of the firearm in a dumpster in another state, the defendant was attempting to distort the results of any criminal investigation or proceeding and avoid future criminal proceedings. We found that other actions by the defendant supported an inference of his specific intent to obstruct justice, including that the defendant took his clothing, poured bleach on it, and discarded the clothing in someone else's trash can in another parish.

Similarly, in *State v. Lopez*, 23-335 (La. App. 5 Cir. 8/21/24), --- So.3d ---, 2024 WL 3885502, this Court upheld the defendant's conviction for obstruction of justice. In that case, the defendant fired shots from a vehicle. A witness testified at trial that the defendant kept the gun when he exited the vehicle. While the defendant fled to Florida, he was later apprehended, but the gun was never found.

In *State v. McGinnis*, 23-472 (La. App. 5 Cir. 7/31/24), 392 So.3d 963, 977, this Court upheld the defendant's obstruction of justice conviction based on his removal of the jacket he was wearing at the time of the murders. This Court found that, based on the evidence presented at trial, a rational juror could have found that, given the small amount of blood visible on the defendant's clothing when he went to the police, he likely believed that the clothes he continued to wear could not

connect him to the shooting. This Court pointed out that the jury also appeared to have found that surveillance video showed that the defendant had taken off his jacket off at the scene immediately following the shooting.

Based on our review of the record in the instant case, we find the trial testimony establishes that Ford fled both crime scenes with the firearm in his possession, after which he discarded the firearm in the overgrown grass near a fence line and attempted to hide his brown hooded sweatshirt in the wheel well of a vehicle while he was being chased by law enforcement after the second shooting in an attempt to avoid detection as the shooter and to distort the results of a criminal investigation. This evidence is sufficient under the *Jackson* standard to support Ford's convictions of obstruction of justice.

This assignment of error is without merit.

## 2. *Denial of Motions to Sever*

Ford's appellate counsel argues the district court erred by denying Ford's motion to sever the seven felony offenses. He contends the district court's decision jeopardized his defense and violated several of the *Fortenberry*, *infra*, factors; namely, the jury became confused between the two police investigations surrounding the two different shootings, the jury inferred a criminal disposition from evidence that Ford supposedly participated in an Academy Sports shoplifting scheme, and the exhausted jury became hostile towards Ford when the district court forced the jury to deliberate until it reached a verdict.

In response, the State argues that the record shows that Ford failed to satisfy his heavy burden of proof in order to establish prejudicial joinder of offenses. The State asserts that the testimony and evidence related to the charged offenses of one date would have been admissible at the trial of the offenses of the other date. It points out that the trial judge stated that the two cases were so intertwined that they needed to be tried together. The State maintains that the crimes were closely

connected in time and place and that a single trial was warranted for the purpose of narrative completeness and in the interest of judicial economy. It also avers that the evidence was not complicated and that the testimony was presented in a logical and organized manner. As such, the State concludes the district court did not abuse its discretion in denying Ford's motion to sever.

Louisiana Code of Criminal Procedure Article 493 permits the joinder of offenses if the offenses charged "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan," and the offenses are triable by the same mode of trial. A defendant properly charged in the same indictment with two or more offenses pursuant to La. C.Cr.P. art. 493 may nonetheless move for a severance of the offenses under La. C.Cr.P. art. 495.1, which provides that "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires."

In determining whether prejudice results from a joinder of offenses, the district court must consider the following factors: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, considering the nature of the charges, the charging of several crimes would make the jury hostile. *State v. Molette*, 17-697 (La. App. 5 Cir. 10/17/18), 258 So.3d 1081, 1091, *writ denied*, 18-1955 (La. 4/22/19), 268 So.3d 304 (citing *State v. Fontenberry*, 09-127 (La. App. 5 Cir. 10/27/09), 27 So.3d 904, 909-10, *writ denied*, 09-2665 (La. 5/28/10), 36 So.3d 246). In addition, it must be considered that prejudice from the joinder of offenses

can be mitigated by clear jury instructions and by an orderly presentation of evidence by the State. *State v. Davis*, 12-512 (La. App. 5 Cir. 4/24/13), 115 So.3d 68, 84, *writ denied*, 13-1205 (La. 11/22/13), 126 So.3d 479.

A defendant alleging a prejudicial joinder of offenses bears a heavy burden of proof. Motions to sever under La. C.Cr.P. art. 495.1 are within the sound discretion of the district court, and its ruling will not be disturbed on appeal absent an abuse of discretion. Factual, rather than conclusory, allegations are required when the defendant alleges prejudicial joinder of offenses on a motion to sever. *Molette*, *supra* (citing *Fontenberry*, 27 So.3d at 910). Finally, there is no prejudicial effect from joinder of offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations. *Butler*, 171 So.3d at 1288. In ruling on such a motion, the district court must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources. *State v. Deruise*, 98-541 (La. 4/3/01), 802 So.2d 1224, 1232, *cert. denied*, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001).

Here, defense counsel filed a motion to sever on May 25, 2022, asking the district court to sever counts one, two, three, and seven from counts four, five, and six. Defense counsel argued that joinder of the counts would result in prejudice to Ford. He asserted that the jury would have a difficult time distinguishing the charges and the evidence, that the charges would be used by the jury to infer a criminal disposition, and that the number and nature of the charges would provoke jury hostility. Thereafter, the State filed a response asking the district court to deny the motion to sever, arguing that the offenses should be tried together because they were all committed in the course of the same criminal activity and at the same

time. It further argued that evidence as to all of the charges would constitute integral act evidence and be admissible under *Prieur*.[17]

A hearing on Ford's motion to sever was held on May 26, 2022, at which time defense counsel and the State argued their respective positions. Defense counsel further argued that the La. R.S. 14:95.1 counts should be severed because Ford was alleged to have prior predicate convictions for attempted murder that supported those counts. At the close of the hearing, the trial judge denied Ford's motion to sever, finding that the same evidence would be presented in both cases and that both cases were integrally connected.

After reviewing the record, we find the district court did not err by denying Ford's motion to sever. After the March 30, 2019 homicide of Hatten, an arrest warrant was issued for Ford. The search for Ford led the JPSO to the car wash, which was the location of the April 1, 2019 homicide of Hensley. Ford fled in a truck following the second homicide, and law enforcement apprehended him and retrieved the firearm he discarded. Additionally, Detective Buttone believed that Hensley was present at the scene of the first homicide, thus providing a motive for Hensley's murder. Both murders occurred approximately two days apart, and only a half mile separated the two crime scenes. In short, the crimes were closely connected in both time and place. Thus, we find that one trial was warranted for the purpose of narrative completeness and in the interest of judicial economy.

It also appears that the testimony and other evidence regarding the charged offenses of March 30, 2019, would have been admissible at the trial of the charged offenses of April 1, 2019. Further, the evidence was not complicated, and the record reflects that the State presented it in a logical and organized manner such that the jury was not confused and did not have difficulty separating the evidence as to each charge. Both homicides had separate lead detectives, and each detective

---

[17]     *State v. Prieur*, 277 So.2d 126 (La. 1973).

questioned Ford separately without the presence of the other detective. Moreover, the La. R.S. 14:95.1 counts were briefly presented by way of stipulation. Significantly, the jury acquitted Ford of attempted second-degree murder on count one, thus indicating that the jury was able to segregate the evidence.[18]

Considering the foregoing, we find the district court did not abuse its discretion by denying Ford's motion to sever the offenses. This assignment of error is without merit.

### 3. *Violation of the Constitutional Mandates of Federal Rules of Evidence, Rule 602*

Federal Rules of Evidence, Rule 602, provides:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

In his first *pro se* assignment of error, Ford argues the State violated Rule 602 of the Federal Rules of Evidence by presenting testimony from James Steib, Aaron Drummond, and Ken Mayeaux, when they lacked personal knowledge of the incident for which they were called to testify.

The State responds that Ford's state criminal trial was not governed by the Federal Rules of Evidence and, further, that he cannot demonstrate that he is entitled to relief under its Louisiana counterpart, La. C.E. art. 101. The State also avers that this issue has not been preserved for appeal through the lodging of a contemporaneous objection at trial pursuant to La. C.Cr.P. art. 841(A). The State further contends that Ford failed to satisfy the requirement of the Uniform Rules–Courts of Appeal, Rule 1-3, which provides that, unless the interest of justice requires otherwise, Courts of Appeal shall review issues that were submitted to the

---

[18] *See State v. Seay*, 521 So.2d 1206, 1210 (La. App. 1 Cir. 1988), where the first circuit found that if the jury could keep the evidence of the offenses separate and distinct as evidenced by acquittal on some and conviction on other charges, there is no prejudice.

trial court. The State contends that even if this issue had been preserved for review, Ford is not entitled to relief.

Louisiana Code of Criminal Procedure Article 841(A) provides:

> An irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

A review of the trial transcript confirms that this issue has not been preserved for appellate review because defense counsel failed to lodge a contemporaneous objection under La. C.Cr.P. art. 841(A) at trial. Consequently, we do not review this assignment of error.

### 4. *Violation of Constitutional Mandates of La. C.Cr.P. arts. 770(1)(2) and 771(1).*

Louisiana Code of Criminal Procedure Article 770 states, in pertinent part:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> (1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
>
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible[.]

Louisiana Code of Criminal Procedure Article 771(1) provides, in pertinent part:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature

that it might create prejudice against the defendant, or the state, in the mind of the jury:

> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770[.]

> \*\*\*

> In such cases, on motion of the defendant, the court may grant a mistrial if is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

In this *pro se* assignment of error, Ford appears to argue that a mistrial should have been ordered under La. C.Cr.P. arts 770(1) and (2), or the jury admonished pursuant to La. C.Cr.P. art. 771(1), when the State presented bad character evidence before the defense had the opportunity to present good character evidence. Ford contends the prosecutor became vindictive after each of the State's key witnesses recanted. Ford further asserts that the prosecutor told the jury that he understood why those witnesses recanted, as they had seen Ford kill and knew that Ford would, likewise, kill them.

In response, the State argues that Ford provides no specific citations to the record in relation to the alleged comments, nor does the record on appeal reflect that such comments were made. Further, the State argues that Ford does not direct this Court to any specific objection lodged as to this issue or establish that a motion for mistrial was ever made. The State also contends that the alleged error does not implicate race, religion, color, or national origin as set forth in La. C.Cr.P. art. 770(1).

Our review of the trial transcript indicates that Ford is not entitled to the relief he seeks, as the transcript does not contain the comments Ford alleges to have been made. Further, there is no indication that an objection was lodged, that a motion for mistrial was made, or that a request for an admonishment was made. Consequently, we find that this assignment was not preserved for appellate review.

### 5. *Violations of the Constitutional Mandates of U.S. Const. Amend. V and La. Const. Art. I, § 15*

Ford argues the State violated the constitutional mandates required by U.S. Const. Amend. V and the La. Const. art. I § 15. Specifically, Ford appears to argue that his convictions of possession of a firearm by a convicted felon, second-degree murder, and obstruction of justice constitute a double jeopardy violation because all the crimes involved the same gun during the course of a single incident. Additionally, Ford argues that his sentences were excessive. He contends that separate sentences for the offenses committed during one sequential, continuing course of conduct was nothing more than the needless imposition of pain and suffering.

The State responds that Ford's argument is evidently based upon an erroneous interpretation of the principles of double jeopardy and has no merit. It further responds that the sentences imposed were not excessive.

### a. Double Jeopardy

While double jeopardy is most properly raised in a motion to quash, and Ford did not file a motion to quash, the issue is still properly before this Court as double jeopardy may be raised at any time. *State v. Austin*, 04-993 (La. App. 5 Cir. 3/1/05), 900 So.2d 867, 884, *writ denied*, 05-830 (La. 11/28/05), 916 So.2d 143. Further, a violation of double jeopardy apparent on the face of the record is reviewable as an error patent. *State v. Pike*, 18-538 (La. App. 5 Cir. 5/8/19), 273 So.3d 488, 500, *writ denied*, 19-927 (La. 2/10/20), 292 So.3d 60.

The Fifth Amendment to the United States Constitution, as well as Article I, § 15 of the Louisiana Constitution, prohibit placing a person twice in jeopardy of life or limb for the same offense. *See also* La. C.Cr.P. art. 591. Double jeopardy provisions are intended to protect an accused not only from a second prosecution

for the same criminal act, but also multiple punishments for the same act. *State v. Lefeure*, 00-1142 (La. App. 5 Cir. 1/30/01), 778 So.2d 744, 750, *writ denied*, 01-1440 (La. 9/21/01), 797 So.2d 669. However, it is well-settled that an accused who commits separate and distinct offenses during the same criminal episode or transaction may be prosecuted and convicted for each offense without violating the prohibition against double jeopardy. *State v. Stephens*, 18-344 (La. App. 5 Cir. 12/5/18), 260 So.3d 776, 783.

The protections against double jeopardy mandated by the federal constitution, as re-stated in this state's constitution, fall within the analytical framework set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *See State v. Frank*, 16-1160 (La. 10/18/17), 234 So.3d 27. Under *Blockburger*, the question is whether the same act or transaction constitutes a violation of two distinct statutory provisions. To determine whether there are two offenses or only one, the pertinent question is whether each provision requires proof of an additional fact, which the other does not. *State v. Knowles*, 392 So.2d 651, 654 (La. 1980); *State v. Bridgewater*, 98-658 (La. App. 5 Cir. 12/16/98), 726 So.2d 987, 991. "[A] defendant can be convicted of two offenses arising out of the same criminal incident if each crime contains an element not found in the other." *State v. Hampton*, 17-383 (La. App. 3 Cir. 11/15/17), 259 So.3d 1125, 1132 (quoting *Frank*, 234 So.3d at 30).[19]

---

[19] Notably, Louisiana courts previously utilized two tests to analyze double jeopardy claims: (1) the "distinct fact" or *Blockburger* test, set forth *supra*; and (2) the "same evidence" test. *State v. Fairman*, 15-67 (La. App. 5 Cir. 9/23/15), 173 So.3d 1278, 1289. The same evidence test is broader in concept than the *Blockburger* test. *Lefeure*, 778 So.2d at 751. However, the same evidence test previously utilized by Louisiana courts to determine whether two crimes constituted the "same offense" for purposes of double jeopardy was rejected by the Louisiana Supreme Court in *Frank*, *supra*, which proclaimed that "the protections against double jeopardy mandated by the federal constitution, as restated in this state's constitution, fall within the analytical framework set forth in *Blockburger*, and Louisiana courts need only apply that framework in analyzing questions of double jeopardy." *See Frank*, 234 So.3d at 33-34. Thus, the Louisiana Supreme Court has instructed Louisiana courts to dispense with Louisiana's separate "same evidence" test. *See Frank*, *supra*.

Under *Blockburger*, courts are required to compare the two criminal statutes at issue and ask "whether each provision requires proof of an additional fact which the other does not." *United States v. Singleton*, 16 F.3d 1419, 1422 (5th Cir. 1994), *cert. denied*, 516 U.S. 924, 116 S.Ct. 324, 133 L.Ed.2d 225 (1995). If either statute contains an element not also found in the other statute, the statutes "fail" the *Blockburger* test, and the defendant may not be punished under both of them "in the absence of a clear indication of contrary legislative intent." *Id*. The two statutory offenses need not be identical to constitute the same offense for double jeopardy purposes. The *Blockburger* inquiry focuses on the statutory elements of the offenses, not on their application to the facts of the specific case before the court or on the actual evidence presented at trial. *Illinois v. Vitale*, 447 U.S. 410, 416, 100 S.Ct. 2260, 2265, 65 L.Ed.2d 228 (1980).

In the case *sub judice*, in order to convict Ford of possession of a firearm by a convicted felon, the State was required to prove that he intentionally possessed a firearm and that he had been convicted of an enumerated felony within the last ten years. *See* La. R.S. 14:95.1. The charge of obstruction of justice necessitated proof that Ford tampered with evidence by the intentional alteration, movement, removal, or addition of any object or substance, with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. *See* La. R.S. 14:130.1. To prove second-degree murder, the State was required to prove the killing of a human being when Ford had the specific intent to kill or to inflict great bodily harm. Although the offenses involved the same firearm, Ford's convictions each required proof of a fact or facts that the others did not.

Additionally, although the two La. R.S. 14:95.1 incidents potentially involved the same gun and involved the same predicate conviction, the shootings happened on two separate dates. Further, Ford was charged with trying to obstruct

two separate and distinct investigations, wherein the murders happened on two separate days and involved two separate victims. Also, the La. R.S. 14:95.1 incidents involved predicate conviction elements that the other offenses did not; the second-degree murder charges involved killings, and the obstruction of justice charges involved the discarding of the firearm and the sweatshirt with the intent of distorting the results of a criminal investigation.

For the foregoing reasons, we find that no double jeopardy violation occurred. This assignment of error is without merit.

### b. Excessive Sentences

The record does not reflect that defense counsel orally objected to the sentences imposed upon Ford or filed a motion to reconsider sentences. Failure to make or file a motion to reconsider sentence, or to state the specific grounds upon which the motion is based, limits a defendant to a review of the sentence for unconstitutional excessiveness only. La. C.Cr.P. art. 881.1(E); *State v. Smith*, 16-406 (La. App. 5 Cir. 8/30/17), 227 So.3d 337, 363, *writs denied*, 17-1643 (La. 9/14/18), 252 So.3d 481, and 17-1660 (La. 9/14/18), 252 So.3d 482. We note that because Ford's counsel did not object to the consecutive nature of Ford's sentences in the court below, Ford is not entitled to review of the consecutive nature of his sentences in this appeal and is limited to a bare review of his sentences for unconstitutional excessiveness. *State v. McGee*, 04-963 (La. App. 5 Cir. 1/11/05), 894 So.2d 398, 412, *writ denied*, 05-593 (La. 5/20/05), 902 So.2d 1050.

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Article I, § 20 of the Louisiana Constitution also prohibits cruel and unusual punishment, but further explicitly prohibits excessive punishment. A sentence is considered excessive, even when it is within the applicable statutory range, "if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless imposition of pain

and suffering and is grossly out of proportion to the severity of the crime." *State v. Dixon*, 17-422 (La. App. 5 Cir. 3/14/18), 241 So.3d 514, 523, *writ denied*, 18-542 (La. 2/11/19), 263 So.3d 415. In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court's sense of justice. *State v. Shaw*, 12-686 (La. App. 5 Cir. 1/16/13), 108 So.3d 1189, 1195.

A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and therefore, is given broad discretion when imposing a sentence. *State v. Warmack*, 07-311 (La. App. 5 Cir. 11/27/07), 973 So.2d 104, 109. The issue on appeal is whether the district court abused its discretion, not whether another sentence might have been more appropriate. *State v. Dorsey*, 07-67 (La. App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130. The review of sentences under La. Const. art. 1, § 20 does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is most appropriate in a given case. *State v. Williams*, 07-1111 (La. 12/7/07), 969 So.2d 1251, 1252 (*per curiam*).

The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D); *State v. Pearson*, 07-332 (La. App. 5 Cir. 12/27/07), 975 So.2d 646, 656. In reviewing a district court's sentencing discretion, the reviewing court should consider the nature of the crime, the nature and background of the offender, and the sentence imposed for similar crimes by the same court and other courts. *Id*. at 656. However, there is no requirement that specific matters be given any particular weight at sentencing. *State v. Tracy*, 02-227 (La App. 5 Cir. 10/29/02), 831 So.2d 503, 516, *writ denied*, 02-2900 (La. 4/4/03), 840 So.2d 1213. Generally maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst

type of offender. *State v. Melgar*, 19-540 (La. App. 5 Cir. 4/30/20), 296 So.3d 1107, 1115.

When determining the sentence to be imposed, a trial judge is not so limited to considering only a defendant's prior convictions, but may properly review all prior criminal activity. *State v. Arceneaux*, 19-472 (La. App. 5 Cir. 1/29/20), 290 So.3d 313, 316, *writ denied*, 20-324 (La. 5/14/20), 296 So.3d 608. The sentencing court may rely on sources of information usually excluded from the courtroom at the trial of guilt or innocence, *e.g.*, hearsay and arrests, as well as conviction records. *Id. See also State v. Myles*, 94-217 (La. 6/3/94), 638 So.2d 218, 219. These matters may be considered even in the absence of proof the defendant committed the other offense(s). *Arceneaux*, 290 So.3d at 316.

Here, the district court sentenced Ford to imprisonment at hard labor for twenty years each on counts two and four (possession of a firearm by a convicted felon), imprisonment at hard labor for forty years each on counts three and five (obstruction of justice), and life imprisonment at hard labor each on counts six and seven (second-degree murder). The district court ordered the sentences on counts two, three, four, and five to run concurrently with each other. The district court further ordered the sentence on count six to run consecutively to the sentences on counts two, three, four, and five, and ordered the sentence on count seven to run consecutively to the other sentences. The district court imposed the mandatory sentences on counts six and seven and the maximum sentences for the remaining counts.

Under the facts and circumstances presented by this case, we find that maximum sentences were warranted. Ford has a criminal history, including convictions of two counts of attempted second-degree murder on February 21, 1995; possession with the intent to distribute cocaine on February 20, 1997; and theft of goods from Academy Sports. As to the nature of the offenses, Ford

unlawfully possessed a firearm and used it to kill two people on two separate days by shooting them in their heads. A third person was hit by a bullet during the first shooting that could have killed him as well. Additionally, Ford left a loaded gun unattended while fleeing from law enforcement, thus causing a risk of harm to others, and he instilled fear in others who had knowledge of his crimes, two of whom recanted their stories.

The JPSO believed that Ford killed Hensley because he witnessed the killing of Hatten. Also, the victim impact statements established that Ford's actions caused great pain and suffering to the members of the victims' families. Further, the jailhouse calls reflect that Ford attempted to arrange for the killing of two potential witnesses against him. At sentencing, Ford did not accept responsibility for his crimes and indicated that he did not commit the murders despite the overwhelming evidence against him, including multiple eyewitnesses and video surveillance.

We find the record supports the sentences imposed.[20] This assignment of error is also without merit.

### 6. Violations of Constitutional Mandates of Rules 402 and 103 of the Federal Rules of Evidence

In his final *pro se* assignment of error, Ford argues the State violated Federal Rules of Evidence, Rule 103, which pertains to rulings on evidence, and Rule 104, which pertains to the general admissibility of relevant evidence. He contends that as investigators of a homicide, the detectives had a mandatory duty to thoroughly

---

[20] *See State v. Sly*, 23-60 (La. App. 5 Cir. 11/2/23), 376 So.3d 1047, 1092, *writ denied*, 23-1588 (La. 4/23/24), 383 So.3d 608 ("We conclude that Sly's mandatory sentence at hard labor for second degree murder is not unconstitutionally excessive."); *State v. Caffrey*, 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, *writ denied*, 09-1305 (La. 2/5/10), 27 So.3d 297 (maximum sentence for a violation of La. R.S. 14:95.1, when the defendant had one prior drug conviction and possessed a loaded firearm at the time of his arrest under circumstances where his actions presented a danger to the public was upheld); and *State v. Royal*, 03-439 (La. App. 5 Cir. 9/30/03), 857 So.2d 1167, 1175, *writ denied*, 03-3172 (La. 3/19/04), 869 So.2d 849 (maximum forty-year sentence for an obstruction of justice conviction was upheld, pointing out that the defendant disposed of a weapon that was used in a murder and that he was convicted of that murder).

investigate relevant evidence of his alibi. He further contends that the admission into evidence of the detective's speculation of his whereabouts was irrelevant and prejudiced his defense. Ford asserts that had detectives checked the place where he told them he was, the cameras in the parking lot and hallways would have proven that he was not at the crime scenes at the time the crimes were committed and did not lie about his whereabouts as the detectives insinuated in their reports. He also asserts that the detectives failed to investigate a Crimestoppers tip that someone else was responsible for the crime.

In response, the State contends that, because the record does not reflect any motions or objections in relation to the alleged errors as required by La. C.Cr.P. art. 841, Ford's arguments should be deemed waived. Further, the State contends that the record does not indicate that Ford filed a written notice of alibi pursuant to La. C.Cr.P. art. 727. The State also argues that even if Ford's arguments are considered, he is not entitled to relief on appeal. The State avers that Ford was permitted to present evidence related to his purported alibi and the Crimestoppers tip at trial, and that he had the opportunity to explore any alleged deficiencies in the police investigation in regard to those matters. Lastly, the State contends the jury heard this evidence and had the opportunity to consider the adequacy of the police investigation.

First, the Federal Rules of Evidence are inapplicable to Ford's state trial. Second, the record shows that Ford failed to lodge a contemporaneous on the grounds of relevancy, and therefore, his argument as to that issue is waived pursuant to La. C.Cr.P. art. 841. Third, as the State notes, Ford did not file a written notice of alibi as required by La. C.Cr.P. art. 727.

Nonetheless, we find that Ford had the opportunity to present evidence at trial regarding his alibi and the Crimestopper's tip and that he was allowed to cross-examine witnesses regarding any alleged deficiencies in the police

investigation regarding those matters. The record reflects that the jury was presented with Ford's recorded statement wherein he discussed his whereabouts at the time of the first shooting. The jury was also presented with Detective Buttone's testimony regarding the investigation of the Crimestopper's tip. As such, we find the jury was in a position to consider the adequacy and manner of the investigation for purposes of weighing the evidence at issue. For these reasons, we find this assignment of error is without merit.

**ERRORS PATENT REVIEW**

The record was reviewed for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). Our review reveals the following errors patent, only one of which requires correction.

**Post-Conviction Relief Advisal**

The transcript reflects that the trial judge incorrectly advised Ford of the provisions of La. C.Cr.P. art. 930.8. The trial judge stated that "no application for post-conviction relief including application should seek an out-of-time appeal shall be considered if it is a little more than two years after the judgment of conviction and sentence has become final." The sentencing minute entry reflects that the trial judge advised defendant that he had "two (2) years after judgement of conviction and sentence has become final to seek post-conviction relief." The transcript prevails where there is an inconsistency between the minute entry and the transcript. *See State v. Lynch*, 441 So.2d 732, 734 (La. 1983).

La. C.Cr.P. art. 930.8 provides that a defendant shall have two years after the judgment of conviction and sentence has become final to seek post-conviction relief. If the trial court fails to advise, or provides an incomplete advisal pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means

of its opinion. *See State v. Becnel*, 18-549 (La. App. 5 Cir. 2/6/19), 265 So.3d 1017, 1022. Accordingly, by way of this opinion, Ford is hereby advised that no application for post-conviction relief, including an application which seeks an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922. *See State v. Barnett*, 18-254 (La. App. 5 Cir. 4/3/19), 267 So.3d 209, 235.

**Mandatory Fine**

The trial judge failed to impose the mandatory fines on counts two and four (possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1) of "not less than one thousand dollars nor more than five thousand dollars." Although this Court has the authority to correct an illegal sentence at any time pursuant to La. C.Cr.P. art. 882, the authority to correct an illegally lenient sentence is permissive rather than mandatory. This Court has previously exercised its discretion to decline to correct an illegally lenient sentence in the case of an indigent defendant. *See State v. Fisher*, 19-488 (La. App. 5 Cir. 6/24/20), 299 So.3d 1238, 1249. Here, Ford is represented by the Louisiana Appellate Project, which represents indigent defendants in non-capital felony cases. Therefore, due to Ford's indigent status, we decline to remand this matter for imposition of the mandatory fines as to counts two and four. *See State v. Manuel*, 20-172 (La. App. 5 Cir. 6/2/21), 325 So.3d 513, 570-71, *writ denied*, 21-926 (La. 10/12/21), 325 So.3d 1071.

## CONCLUSION

For the foregoing reasons, Ford's convictions and sentences are affirmed.

**CONVICTIONS AND SENTENCES AFFIRMED**



SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **FEBRUARY 26, 2025** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 24-KA-197

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE JUNE B. DARENSBURG (DISTRICT JUDGE)
ANDREA F. LONG (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          PRENTICE L. WHITE (APPELLANT)

**MAILED**
ALONZO W. FORD #337463 (APPELLANT)     HONORABLE PAUL D. CONNICK, JR.
LOUISIANA STATE PENITENTIARY          (APPELLEE)
ANGOLA, LA 70712                      DISTRICT ATTORNEY
                                     KRISTEN LANDRIEU (APPELLEE)
                                     LEO M. AARON (APPELLEE)
                                     ASSISTANT DISTRICT ATTORNEYS
                                     TWENTY-FOURTH JUDICIAL DISTRICT
                                     200 DERBIGNY STREET
                                     GRETNA, LA 70053